claims would have been held to be lost by neglect to prosecute: but. the libellants being seamen, it was the duty of the court of admiralty to prevent their losing their claims by reason of the negligence of their proctor, if it could be done without injustice.

2. No injustice would be done here by a decree in favor of the seamen, as the claimants were the same and were chargeable with knowledge of the fact of the loss of the seamen's effects.

3. The transfer of the stock of the corporation made no difference. for it could not be supposed that such claims as these could have made any difference in the value of the stock.

4. The seamen thcrefore must have a decree for half their damages without interest or costs.

In admiralty. ·

Beebe, Wilcox & Hobbs, for libellants.
John Sherwood, for claimants.

[NOTE. There is no report of either of these cases in the supreme court, and an examination of the supreme court docket fails to show any such case having been docketed. The records of the circuit court show that on October 2, 1873, a petition and bond on appeal were filed, but the proceedings appear to have been carried no further. In Case No. 8,254 the circuit court held (reversing Case No. 8,251) that the collision was the result of negligence of both vessels.]

---

## Case No. 8,254.

### The LEO.

[11 Blatchf. 225.][1]

Circuit Court, E. D. New York. July 2, 1873.[2]

COLLISION — STEAMER AND SAIL VESSEL — THICK AND STORMY—FULL STEAM—LOOKOUT—DUTY OF SAIL VESSEL TO BLOW FOG-HORN.

1. In a dark, thick and stormy night, and against a strong wind, a head sea, and the tide,

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
[2] [Reversing Case No. 8,251.]

a steamer was making all the speed she could, carrying steam up to the limit of her right. She collided with a sailing vessel: *Held*, that she was in fault for not slackening her speed.

2. Under articles 15 and 16 of the act of April 29, 1864 (13 Stat. 60, 61), the positive duty of avoiding collision with a sailing vessel is imposed on a steamer, and the speed of the steamer should be so regulated that she may be under control, and a collision be avoided, after the presence of the other vessel is ascertained.

[Cited in Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 26 Fed. 602.]

3. A steamer *held* in fault for not keeping a sufficiently careful lookout to discover the lights of a sailing vessel which she ought to have seen at a distance within which a collision could have been avoided by her after seeing such lights.

4. A sailing vessel under way *held* in fault for not blowing a fog-horn in a fog.

5. Neglect to blow a fog-horn being established, the vessel must show affirmatively that the horn, if blown, could have produced no effect.

6. Both vessels being in fault, the damages were apportioned.

[Appeal from the district court of the United States for the Eastern district of New York.] In admiralty.

Charles Donohue, for libellants.

Edward H. Owen and John Sherwood, for claimants.

HUNT, Circuit Justice. On the night of November 30th, 1869, at about 10½ o'clock, a collision took place between the steamer Leo and the schooner Falcon,[3] off the coast of New Jersey. The schooner and her cargo were an entire loss. The district court made a decree in favor of the schooner. [Case No. 8,251]. Upon a reference, the damages were established at $10,849 41, which were confirmed by the court.

It is agreed by both parties, all the witnesses concurring on that point, that it was wet, dark and thick weather. Some of the witnesses testify that the stars were to be seen from time to time, while others testify that it was so dark that a light was visible at a very short distance only. The wind was from the southwest, and the sea was high. I will consider, in the first place, whether there was fault in the conduct or condition of the steamer.

1. It is alleged that the steamer started from Sandy Hook in a fog, and that she was in fault in so doing, and took all the risks resulting from that action. The evidence does not sustain the fact assumed in this position. It is disproved by all the witnesses who were on board of the steamer, and by Captain Blakeman of the Niagara. It is not proved positively by any witness, and the inferential evidence in favor of it cannot stand for a moment against the direct evidence to the contrary.

2. It is said that the steamer was going at too great a rate of speed, carrying 27 pounds

[3] [The name Falcon appears only in Judge Hunt's opinion. Reference to the court files discloses the name of the schooner to be the Saxon, as reported in Cases Nos. 8,251 and 8,253.]

of steam. The engineer testifies, that this was the limit of his right to carry steam, and that the owners directed him to carry 27 pounds only, although he did carry more, in his discretion, with their knowledge and assent. The evidence is, that the steamer, against a strong wind, a head sea and the tide, was making six or seven miles an hour, while nine or ten was her maximum, under favorable circumstances. She carried the same amount of steam under these unfavorable circumstances, as when in daylight, she was in the smooth water of the bay, and this in a night confessedly dark and stormy, and, as stated by her own officers, in a thick, heavy fog.

By the statute regulations for preventing collisions on the water, article 16 (13 Stat. 61), it is provided: "Every steamship, when approaching another ship, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse; and every steamship shall, when in a fog, go at a moderate speed." The district judge held, that, under the circumstances established by the evidence, the steamer failed sufficiently to slacken her speed, and did not limit herself to a moderate speed. As already stated, she was making about all the speed she could make. She did not slacken any further, or otherwise, than that, notwithstanding her efforts, the wind, the seas and the tide enforced a lower rate of speed. That it was not sufficiently moderate, the unfortunate collision tends strongly to establish. The speed should be so moderate that the steamer may be under control, and collision avoided, after the presence of the other vessel shall have been ascertained. This provision of law is to be construed in connection with article 15 of the same statute, which enacts as follows: "If two ships, one of which is a sailing ship and the other a steamship, are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing ship." The positive duty of avoiding collision is imposed on the steamer, and her speed must be so regulated as to enable her to perform that duty. I agree with the court below, that, in this respect, the steamer failed in the performance of her duty.

3. Did the men on board of the steamer keep a good lookout? That she ran into the schooner is beyond doubt. That this arose from some other cause than an intention to injure, is to be assumed. The reason is assigned by the steamer's officers and crew, that the weather was such that it was impossible to discover the schooner in time to avoid the collision. It is expressly proved, and not contradicted, that both vessels carried the lights required by statute, and that they were in good order. The question then is—if a careful lookout had been kept, could the lights on board the schooner have been seen by the steamer in time to prevent the collision?

Of the schooner's crew, John Herd testifies,

that he saw the steamer's lights a quarter of a mile off, and about four minutes before the collision. In another place, he says he saw the lights a quarter of an hour before the collision, and at the distance of nine times the length of the steamer. Thomas Cassidy makes about the same statement, but under circumstances less favorable for understanding the facts, having been aroused from sleep by the captain's shouts that a steamer was upon them. Captain Parrott, of the schooner, was at the wheel at the time of the collision, and testifies that he saw the steamer's lights at the distance of half a mile, and saw her hull at the distance of a quarter of a mile, and that, when he saw her, he hailed for all hands to come on deck. It was this hail that brought out the witness Cassidy.

On the part of the steamer, her master testifies that he was in his cabin, near the pilot-house, at the time the report of a "light under the bow" was made, that he jumped for the pilot-house, ordered the helm hard a-port as soon as he saw the light, and rang the bells to slow, stop and back; and that, almost instantaneously, the collision occurred. He testifies that he had been on the lookout himself the most of the time after eight o'clock, but that, just before the collision, he had gone down into his own room to make some change in his clothing. He does not state that immediately before the collision he was on the lookout, but states facts from which it is obvious that he could not have been. Benjamin Wood, the second officer of the steamer, testifies that he was near the wheel in the pilot-house, at and before the collision; that he had been keeping a good lookout; and that there was not the lapse of more than half a minute between seeing the schooner's light and the collision. He states, however, that tne weather was such that he could see distinctly the two men on the lookout of the steamer, who stood at thirty feet distance from him. John Andrews, a seaman, testifies, that he was on the lookout of the steamer from eight o'clock until after the collision; that he was the first one on board of her who saw the schooner's lights; that he gave notice; and that he could not see a light further than the length of the vessel. It is, perhaps, to be inferred, that he means it to be understood that he was careful in his watch, and was vigilantly looking out in the direction of the schooner, and that he did not see her sooner because it was so dark and foggy that he could not. It would have been more satisfactory if he had so stated in words.

Unless I am in error, these are all the witnesses who speak of the power to see the lights of either vessel, who were on the deck of either vessel at the time of the collision or immediately before. The evidence of the witnesses who speak on this point from observations after the collision, and whose attention had not been directed to the point of whether the lights could be seen, is less forcible than evidence of the character I have adverted to. The affirmative evidence of those who did see lights at a distance within which the steamer could have been stopped or her course altered, and the circumstances attending the evidence of the steamer's witnesses, render it beyond any reasonable doubt that the steamer could and ought to have seen the schooner's lights at a distance of at least a fourth of a mile. Her second officer testifies that she could have been stopped within twice and a half of her length, a distance probably of five or six hundred feet. I am satisfied, upon this review of the evidence, that the lookout of the steamer was not well kept, and that she was in fault in this respect.

Assuming the steamer to have been in fault, it is argued that the schooner was also in fault, in not using the fog-horn immediately preceding the collision. The statute already cited, in article 10, provides as follows (13 Stat. 60): "Whenever there is a fog, whether by day or night, the fog signals described below, shall be carried and used, and shall be sounded at least every five minutes, viz.: (a) Steam ships under way shall use a steam whistle placed before the funnel, not less than eight feet from the deck. (b) Sailing ships under way shall use a fog-horn. (c) Steamships and sailing ships when not under way shall use a bell." The schooner had on board an ordinary fog-horn and a patent fog-horn, but did not use them on this occasion. The steamer insists that there was a fog then prevailing. The schooner insists that there was not. That there was a thick, heavy fog is sworn to by Captain Dearborn of the steamer, first officer Perry, second officer Wood, engineer Wagner, and seaman Andrews. Their evidence is corroborated by Captain Blakeman of the Niagara, who was going in the same direction with the Leo, and about two hours in advance of her. He says, that, when he passed Sandy Hook, at 5.17 p. m., there were strong indications of thick fog; that, soon after, the wind increased almost to a gale; that the fog came on thick, heavy, and so dense that he could scarcely see; and that it so continued until after 1 a. m. It is argued, and is altogether probable, that, to a greater or less extent, the same fog prevailed, as the same wind certainly did, where the Leo and the schooner were, and at the time the collision occurred. Captain Dearborn says: "It continued foggy, continued very foggy, up to two o'clock in the morning. There was still a thick fog. The ship was making water." Perry, the first officer of the steamer, says: "Was it or not foggy or misty? Yes. Was there any rain? Yes, light drizzling rain. It was very thick. I could not see the length of the vessel. Was there any fog or mist at that time? Yes, very thick indeed."

Wood, the second mate, says: "I went on deck to look at the vessel we had collided with. She had passed out of sight, the fog was so dense. * * * You might see forty or fifty feet in that fog; it would be hard to say, but the distance would be very short." The seaman Andrews says: "It was a dark, dirty, foggy night, raining a drizzling rain the whole night."

The evidence on the part of the schooner is scarcely in contradiction of this evidence. It seems to be founded chiefly upon the distinction between a fog and a mist. No doubt, it may sometimes be difficult to say when the watery vapor surrounding a ship ceases to be fog, a damp heavy vapor, and becomes a mist, where the drops fall, but in size so small that they are almost imperceptible. The one form is easily changed into the other and as readily rechanged to its former condition, and, at times, the vapor may well be partly fog and partly mist. Thus, the witness Herd, of the schooner, says: "There was a kind of mist. You could not call it a heavy fog." A fog may well be termed a kind of mist, and, in saying that it was not a heavy fog, he implies that it was a fog of some kind. Captain Parrott, of the schooner, says: "I did not see any fog, not enough to blow any horns or whistles. It was thicker at half-past ten than at eight." The captain here almost admits that there was fog, but thinks there was not enough of it to require the horn to be blown. Cassidy, the mate of the schooner, thus states it: "What was the weather when you went below (two hours and a half before the collision?) Dark and overcast. How was it about there being any fog? I should not call it foggy—dark and overcast." Cassidy, the sick captain, who came on deck after the collision, says: "When you went below, what was the character of the atmosphere; how about there being a fog? I didn't call it foggy. How was it when you got on deck, with the way it was when you went below? I should say it was about the same. Was there any fog? No. Was there any haze on the water? No. Was there any thickness of fog sweeping along? No." The testimony of Captain Parrott is somewhat affected by the evidence of Mr. Wilbour, that Parrott had, on a previous occasion, stated that, at the time of the collision, it was very foggy, so much so that he could not see the length of his vessel.

It is argued, that there cannot be a fog during the prevalence of a gale of wind. No evidence is found in the case to sustain this theoretical proposition. On the contrary, Captain Blakeman testifies, that, on his passage, there prevailed, at the same time, a dense fog and a gale of wind. It is not known to me to be correct, as a theory of natural philosophy.

Upon the whole evidence, there is scarcely room for a fair doubt, that a fog prevailed at the time of the collision. It was, therefore, the duty of the schooner to have sounded her horn as often as once in every five minutes. This, it is conceded by the captain of the schooner and the others on board of her, was not done.

The appellants insist, that, for this negligence, in violation of the positive direction of the statute, the right of recovery on the part of the owners of the schooner is gone; and that, having contributed themselves to the injury, they cannot recover against another, who has also been negligent.

It is insisted, on the other hand, that, if blown, the horn could not have been heard on board the steamer, and thus that no injury was caused by its negligent omission. Neglect to obey the positive injunction of the statute being established, it is the duty of the schooner, or her owners, to establish affirmatively, that the horn, if blown, could have produced no effect. Water is a ready communicator of sound. A hail, a shout, or a horn can be heard much further upon the water than upon the land. On smooth water, and with a favorable breeze, the sound can be heard much further than upon a rough sea or against a head wind. On this occasion the night was boisterous. The sea was high, and the machinery of the steamer may be assumed to have made the rattling and the noise usual in a large vessel of that character. On the very front of the steamer were two men stationed as a lookout. I have stated that I believe them to have been negligent in the discharge of this duty, and that they might have seen the schooner at a distance of half a mile, or, certainly, at the distance of a fourth of a mile. If the patent fog-horn on board the schooner had been sounded, when within a half-mile of the steamer, would they not have heard it, and given immediate notice to the officer in charge? If the notice had reached them when within a fourth of a mile, or even an eighth of a mile, of the schooner, the disaster could have been avoided. It is testified, that the steamer could be stopped entirely within twice and a half her length. This, however, was not necessary, as a slowing, or a slight sheering to the east by the steamer, would have been sufficient to avoid a collision. These men may have been negligent in not seeing the schooner's lights, but I see no reason to think that, sitting on the stem of the steamer, with the wind directly from the schooner, they would not have heard the horn, if it had been blown, and been roused to their duty. The schooner would be less likely to hear the steamer's whistle, its sound coming directly against the strong gale. The men on board the steamer, at and after the collision, may have been unable to hear shouts and cries coming from the schooner. The alarm and confusion incident to the occasion, and the adverse wind after the schooner had left them, may well explain this. I am compelled,

however, to think, that there is no ground for the argument, that, if blown, the fog-horn could not have been heard. The evidence strongly impresses me with the belief, that it might have been, and probably would have been. heard, in time to have enabled the steamer to avoid the disaster. The vessels were in the track of the great coasting trade of this continent. Every vessel bound to or from the commercial emporium of the continent and the Southern States would pursue this track. Every means known to good mariners to give notice of each other's approach, should be used, while in this travelled track. It was, in my judgment, great negligence in the schooner to omit the use of her fog-horn. There is good reason to think that its use might have prevented the present disaster. I hold that both parties were in fault, and that the decree must be reversed, and a decree be entered apportioning the damages.

[This case was afterwards heard in the district court upon the libel of the seamen for wages. Case No. 8,253.]